60 P.3d 899

**STATE OF Hawai'i, Plaintiff–Appellee,**

v.

**Ivan FUKAGAWA, Defendant–Appellant.**

**No. 22810.**

Supreme Court of Hawai'i.

Dec. 30, 2002.

Theodore Y.H. Chinn, Deputy Public Defender, on the briefs, for defendant-appellant.

Richard K. Minatoya, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; RAMIL, J., dissenting; and ACOBA, J., dissenting.

Opinion of the Court by MOON, C.J.

Defendant-appellant Ivan Fukagawa appeals from the judgment of conviction and sentence of the Circuit Court of the Second Circuit, adjudging him guilty of: (1) driving under the influence of intoxicating liquor, in violation of Hawai'i Revised Statutes (HRS) § 291-4 (Supp.1998)[1] (Count One); (2) promoting a dangerous drug in the third degree, in violation of HRS § 712-1243(1) (1993 & Supp.1998)[2] (Count Two); and (3) prohibited acts relating to drug paraphernalia, in viola-

---

1. HRS § 291-4 states in pertinent part:

(a) A person commits the offense of driving under the influence of intoxicating liquor if:

(1) The person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor, meaning that the person concerned is under the influence of intoxicating liquor in an amount sufficient to impair the person's normal mental faculties or ability to care for oneself and guard against casualty; or

(2) The person operates or assumes actual physical control of the operation of any vehicle with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath.

2. HRS § 712-1243 states in pertinent part:

(1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

. . . .

(3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall be not less than thirty days and not greater than two-and-a-half years, at the discretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

tion of HRS § 329–43.5(a) (1993)[3] (Count Three). Fukagawa claims that the motions court, the Honorable Shackley F. Raffetto presiding, erred in denying his motion to dismiss the charge of promoting a dangerous drug in the third degree. Specifically, Fukagawa alleges that the motions court erred by: (1) admitting the testimony of the prosecution's witness, who indicated that the crystal methamphetamine residue recovered from Fukagawa's pipe may have contained a usable amount of the drug; and (2) denying Fukagawa's motion to dismiss the charge as a de minimis infraction, pursuant to Hawai'i Revised Statutes (HRS) § 702–236 (1993).[4] For the reasons discussed below, we affirm the order denying Fukagawa's motion to dismiss and the judgment of conviction and sentence of the circuit court.

## I. BACKGROUND

On January 15, 1999, Fukagawa was charged by indictment with driving under the influence of intoxicating liquor, promoting a dangerous drug in the third degree, and prohibited acts relating to drug paraphernalia. On June 14, 1999, Fukagawa filed a motion to dismiss the charge of promoting a dangerous drug in the third degree, asserting that the charge constituted a de minimis infraction. A hearing on the motion was held on July 1, 1999.

At the outset of the hearing on Fukagawa's motion, the parties stipulated to the admission of the Maui Police Crime Laboratory Analysis Report Number 98–14511 (identified as "State's Exhibit 1"), prepared by Julie Wood, which indicated that the substance recovered from a glass pipe in Fukagawa's possession weighed .018 grams and contained methamphetamine. The parties also agreed that,

> if Julie Wood were called to testify, she would testify she followed normal accepted procedures in determining the information on this report, and that the pipe recovered under Maui Police Department Report Number 98–14511, after was [sic] tested there was .018 grams of crystal methamphetamine determined to be in that pipe, and it was visible to the naked eye.[5]

The defense called George Wesley Read, Ph.D., a professor of pharmacology, to testify on its behalf. Read was qualified as an expert in the field of pharmacology.[6] Read testified, inter alia, that "[m]ethamphetamine has at least three currently-accepted uses and possibly a fourth." According to Read, methamphetamine has been used to treat obesity, narcolepsy, attention deficit hyperactive disorder (ADHD), and fatigue. Based upon his review of the available literature, Read testified that ranges of methamphetamine dosages used to treat obesity, narcolepsy, ADHD, and fatigue are: .01 to .04 grams; .05 to .06 grams; .005 to .015 grams; and .01 to .04 grams, respectively.[7]

3. HRS § 329–43.5(a) states:
It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

4. HRS § 702–236 provides in pertinent part:
(1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:
(a) Was within a customary license or tolerance, which was not expressly refused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense; or

(b) Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or
(c) Presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.

5. On its face, it appears that the parties stipulated that Wood would have testified that .018 grams of crystal methamphetamine was in the pipe; however, given the content of her report, the testimony of the other witnesses, and the arguments presented, it appears that the parties intended to stipulate that Wood would have testified that the .018 grams contained crystal methamphetamine.

6. Read explained that pharmacology is the study of the effect of chemicals on living organisms.

7. The defense offered for identification a handout, entitled "Methamphetamine Doses for Vari-

With respect to the abuse of methamphetamine—*i.e.,* use of the drug to achieve "euphoria and elation,"—Read testified that a "naive user" [8] would use between .05 and .1 grams. When asked about the purity of drugs obtained on the street, Read explained that

> there are papers in the technical literature that describe the purity, and it can be very impure, but often might be fifty percent of what is sold might be salt, but it can vary depending upon the purity, that is the conscientiousness of the lab preparing it and a lot of variables, *so it is hard to speak generally about that.*
>
> *You almost have to talk about a specific product, some specific products that's [sic] been analyzed, and then you see very clearly what the purity is . . . .*

(Emphasis added.) Additionally, Read testified that there is a difference between the drug as it is purchased and the residue that remains in a pipe after use. Read explained:

> So you might say that in a street drug it might be half, or maybe even more of the main drug, but after it is smoked, what is left might be trace amounts of the drug and hardly usable, so depends [sic] on how hard it has been smoked, too. They might put some in, light it, smoke it for awhile, use half of it, set it aside, and heat it again and use some more from it. Eventually, it becomes unusable, and because there's no drug left, that residue then might still have detectable amounts of drug in it, but we would call them trace amounts.

Read did not indicate that he performed any analysis on the substance weighing .018 grams recovered from Fukagawa's pipe. With respect to the analysis actually performed on the substance recovered from Fukagawa in the instant case, defense counsel and Read had the following exchange:

Q. [By defense counsel] In preparation for this hearing did you have a chance to view a Maui Police Department report lab analysis form?

A. [Read] Yes, I did.

Q. Do you have a copy in front of you?

A. I believe I do.

Q. Are you familiar with the procedures, examination, and analysis of substance by the crime laboratory?

A. If it is a typical one, yes. There are several different procedures. I am not sure I am familiar with the particular one used here on Maui, but they're usually fairly good tests.

Q. On this report do you see a determination of the weight of the substance?

A. I see there's .018 grams was scraped from the pipe.

Q. Doctor Read, in your expert opinion would eighteen milligrams or .018 grams produce a euphoric or pharmacological effect for an illicit user?

A. No. A person of—average normal person I would not expect that would produce any of the effects that they would be after. If it were pure methamphetamine, even if it were pure methamphetamine, even then I don't think it would produce the high that would be sought after.

Q. In your opinion would a person be able to use that .018 grams as an item of sale?

A. Not for illicit use. If it were from a drug company and known to be pure, it would have use therapeutically. At that level it could be used, but no physician or researcher would buy an uncertified drug, so I would never buy this for research purposes, and I don't think a physician would prescribe it not knowing its purity, *but the question is how much is it really. You don't know. You would not want to prescribe an amount of a drug that you don't know how much active ingredients is [sic], because that might be one-tenth that amount, might be half that methamphetamine, so you'd get an unpredictable response not*

---

ous Actions." However, the record on appeal indicates that this exhibit was not admitted into evidence.

**8.** Read defined a "naive user" as "a first-time user who was not tolerant, or a person who . . . didn't have [an] opportunity to develop [a] tolerance [and] could take a lot smaller dose and achieve the same euphoria and elation."

*knowing how much drug is actually there.*

(Emphasis added.)

On cross-examination, Read stated that he had neither met nor examined Fukagawa and that his testimony regarding the effects of various doses of methamphetamine did not account for Fukagawa's individual physical characteristics. Read testified that drugs are diluted in larger body sizes, explaining that a person weighing twice as much as another individual would have to take approximately twice as much drug to get the same response as his lighter counterpart. Read also stated that the dose response results alluded to in his testimony were proportional to a person weighing seventy kilograms, or about 150 pounds. Upon examination by the court, Read testified that he did not know the weight of the children who participated in the studies he reviewed regarding the use of methamphetamine to treat ADHD.

Maui Police Department Officer Dennis Lee testified on behalf of the prosecution. Lee stated that he had received training in the identification and testing of illegal drugs and drug paraphernalia. Specifically, Lee testified that he had received "eight hours of specialized training from Bectin Dickinson instructors in the field testing of illegal drugs" and "forty hours of basic investigation and drug identification from the Drug Enforcement Administration." Lee stated that he: (1) was certified by the Maui Police Department to field test evidence for the presence of illegal drugs; (2) had experience field testing evidence for the presence of illegal drugs; and (3) had tested evidence for the presence of methamphetamine well over a hundred times in the past.

Lee testified that, on May 26, 1998, he received an assignment to field test evidence recovered from Fukagawa, which had been sealed in an evidence packet recorded under Maui Police Report Number 98–14511. Lee stated that he removed a glass pipe from the evidence packet, which he identified as the kind of pipe normally used to smoke crystal methamphetamine. Lee testified that the field test on a sample of the residue contained in the glass pipe, performed in accordance with his training and experience, indicated the presence of amphetamines.

However, Lee stated that the test he had performed did not indicate the amount of methamphetamine contained in the substance tested. Lee also testified that methamphetamine is classified as a dangerous drug.

On direct examination, Lee had the following exchange with the prosecutor:

Q. [By the prosecutor] Through your training and experience, do you know how crystal methamphetamine is used in a pipe like the one you tested?

A. [Lee] Yes.

Q. How?

A. They smoke it.

Q. How is it used? How is that pipe, itself, used?

A. What they do is on this pipe on the bulbous end, there's a little hole. They drop a granule of ice in there, and with a high-intensity torch or lighter, they heat it up and they smoke it.

Q. Can you tell me if the residue in the pipe you tested prior to your scraping and field testing was of an amount sufficient to be used by somebody?

A. Possibly, yes.

At that point, defense counsel objected, arguing that Lee was not qualified to answer the prosecutor's question. The court overruled the objection, stating, "Goes to weight." On cross-examination, Lee testified that he had not received any Bachelor of Science degree in any physical chemistry sciences and that his associate's degree was not in a scientific field.

The motions court denied Fukagawa's motion to dismiss, stating:

The amount that was actually measured here in the lab which apparently was less than the actual amount of amphetamine because of the—apparently was tested twice is actually more than the maximum dosage used for—to correct attention deficit hyperactivity disorder. It is more than the maximum dose recommended by one of the studies, one of the three studies for obesity, and it is more than the maximum dosage recommended by one of the four studies for the treatment of narcolepsy, so

it is obvious that while one might debate how much is enough to get a person high, that this was an amount that was usable, and then, also, the evidence shows that it was in a pipe and so on.

It was obviously there to be used by the defendant. He probably used it, in fact. So it was not the kind of situation where a person borrowed a car and just happened to be something in the ashtray. It was a very small amount, and we are looking at a fact situation where be [sic] really a miscarriage of justice for the person to end up with [a] felony conviction because of inadvertence or something like that.

Here we have a person who had the equipment to use it, no doubt was using it, and that is the very harm that the statute is designed to address.

Now the case as pointed out talks about the possibility of applying the de minimis standard if there's—the amount is microscopic or infinitesimal, and in fact unusable as a narcotic. I am reading the word narcotic to include with—what do you call it—stimulant, and what I am assuming the Court means a drug that has, at least, potential for and affects the central nervous system or the mind, and here I think the amount clearly could do that, and that the de minimis standard would be inappropriate to apply, and I am going to deny the motion.

A written order denying Fukagawa's motion to dismiss was filed on July 12, 1999.

Pursuant to a plea agreement with the prosecution, Fukagawa withdrew his original plea of not guilty and entered a conditional plea of no contest to all three counts of the indictment, reserving his right to appeal the issues raised in this case. The circuit court accepted Fukagawa's no contest pleas, and, on August 31, 1999, Fukagawa was sentenced to, *inter alia*, a five-year indeterminate maximum term of imprisonment, subject to a thirty-day mandatory minimum term, for Count Two and a five-year indeterminate maximum term of imprisonment for Count Three, the two terms to run concurrently. Fukagawa filed a timely notice of appeal on September 13, 1999.

## II. STANDARDS OF REVIEW

### A. Admission of Expert Testimony

" 'Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion.' " *State v. Fukusaku*, 85 Hawai'i 462, 472, 946 P.2d 32, 42 (1997) (quoting *State v. Maelega*, 80 Hawai'i 172, 180, 907 P.2d 758, 766 (1995)). "An abuse of discretion occurs when the decisionmaker exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *State v. Vliet*, 95 Hawai'i 94, 108, 19 P.3d 42, 56 (2001) (internal quotation marks and citations omitted).

### B. Decision Not to Dismiss a Charge as a De Minimis Infraction

A trial court's decision under HRS § 702–236, governing de minimis infractions, is reviewed for an abuse of discretion. *State v. Viernes*, 92 Hawai'i 130, 133, 988 P.2d 195, 198 (1999) (citations omitted).

## III. DISCUSSION

### A. Admission of Lee's Testimony

Fukagawa argues that Lee was not qualified to testify that the residue contained in the pipe recovered from Fukagawa may have been an amount sufficient to be used because Lee's qualifications to testify as to the use, ingestion, or pharmacological effects of methamphetamine were not established. We disagree.

Hawai'i Rules of Evidence (HRE) Rule 702–(1993) states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

With respect to an expert's qualifications, this court has noted,

> It is not necessary that the expert witness have the highest possible qualifications to testify about a particular matter, ... but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth.... Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.

*State v. Toyomura*, 80 Hawai'i 8, 26 n. 19, 904 P.2d 893, 911 n. 19 (1995) (quoting *Larsen v. State Sav. & Loan Ass'n*, 64 Haw. 302, 304, 640 P.2d 286–288 (1982)).

In the present case, Lee testified that he received field training in the testing and identification of illegal drugs and drug paraphernalia. Additionally, Lee testified that, through his training and experience, he knew how a pipe, like the one recovered from Fukagawa, is used and explained how crystal methamphetamine is smoked in such a pipe. Thus, the prosecution had laid a sufficient foundation establishing Lee's knowledge and experience in how crystal methamphetamine is smoked in a pipe like that recovered from Fukagawa. Moreover, Lee was never asked any questions regarding the pharmacological effect of the methamphetamine recovered. Therefore, the circuit court, in allowing Lee's testimony, did not exceed the bounds of reason or disregard rules or principles of law or practice to the substantial detriment of a party. Accordingly, we hold that the circuit court did not err in allowing Lee to testify that the residue contained in the pipe recovered from Fukagawa may have been an amount sufficient to be used.

### B. Decision Not to Dismiss a Charge as a De Minimis Infraction

Fukagawa argues that the circuit erred in denying his motion to dismiss because the amount of methamphetamine recovered was neither useable nor saleable and, therefore, constituted a de minimis infraction.[9] We disagree.

■ As noted *supra*, de minimis infractions are defined by HRS § 702–236, which states that a court may dismiss a prosecution if, considering "the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct .... [d]id not actually cause or threaten the harm or evil sought to be prevented[,] ... or did so only to an extent too trivial to warrant the condemnation of conviction[.]" Regarding the application of HRS § 702–236, this court recently explained:

> Prior to resolving whether an offense is *de minimis*, pursuant to HRS § 702–236, the trial court must undertake factual determinations. *See State v. Park*, 55 Haw. 610, 616–17, 525 P.2d 586, 591 (1974) (noting that, "before the code's § 236 can be properly applied in a criminal case, all of the relevant facts bearing on the defendant's conduct and the nature of the attendant circumstances regarding the commission of the offense should be shown to the judge" so that the judge may "consider all of the facts on this issue").

*Viernes*, 92 Hawai'i at 133, 988 P.2d at 198 (citation omitted). Dismissing a charge without any indicators from the surrounding circumstances to demonstrate a de minimis infraction would be an abuse of discretion. *See Park*, 55 Haw. at 617, 525 P.2d at 591–92. Additionally, "as this court's de minimis cases attest, the defendant must establish that his or her conduct neither caused nor threatened to cause the harm or evil that the statute, under which he or she is charged, seeks to prevent." *State v. Oughterson*, 99 Hawai'i 244, 256, 54 P.3d 415, 427 (2002) (citations and underscoring omitted).

■ With specific reference to HRS § 712–1243, this court has noted that Hawai'i's drug laws were intended to control the use and sale of illicit drugs, *State v. Vance*, 61 Haw. 291, 307, 602 P.2d 933, 944, *reh'g denied*, 61 Haw. 661, 602 P.2d 933 (1979), and to address related social harms, including

---

9. In his statement of points of error on appeal, Fukagawa challenges various findings of fact by the motions court. However, no corresponding argument appears in the argument section of the opening brief. We therefore deem these allegations of error to be waived. *See* Hawai'i Rules of Appellate Procedure Rule 28(b)(7) (2000).

property and violent crimes. *Viernes*, 92 Hawai'i at 134, 988 P.2d at 199. In determining whether a defendant's conduct caused or threatened the evils sought to be prevented by drug laws, this court has considered the amount of drugs a defendant possessed as one of the relevant circumstances to be considered. *See id.* at 134–35, 988 P.2d at 199–200; *Vance*, 61 Haw. at 307, 602 P.2d at 944. Specifically, in *Viernes*, this court noted, *inter alia*, the "uncontroverted evidence that .001 grams of methamphetamine[ ] could not produce any pharmacological action or physiological effect[.]" *Viernes*, 92 Hawai'i at 134, 988 P.2d at 199 (emphasis omitted). However, quantity is only one of the surrounding circumstances a court must consider. *Vance*, 61 Haw. at 307, 602 P.2d at 944 ("the possession of a microscopic amount in combination with other factors indicating an inability to use or sell the narcotic, may constitute a de minim[i]s infraction"); *see also Viernes*, 92 Hawai'i at 135, 988 P.2d at 200 (upholding the circuit court's dismissal of a charge as de minimis based upon the uncontroverted evidence that .001 grams of methamphetamine was neither useable nor saleable and the circuit court's findings of fact establishing that it had considered all of the relevant circumstances); *State v. Sanford*, 97 Hawai'i 247, 256, 35 P.3d 764, 773 (App.), *cert. denied*, 97 Hawai'i 247, 35 P.3d 764 (2001) (upholding the circuit court's denial of a motion to dismiss a charge as de minimis based upon, *inter alia*, "the juxtaposition of drug repositories, smoking device and smoked residue, and especially the possession of such depleted drug contraband by one engaged in shoplifting"). Before dismissing a charge as a de minimis infraction, a court must consider the amount of drugs possessed and the surrounding circumstances to determine if the defendant's conduct caused or threatened the harm or evil sought to be prevented by the law defining the offense sufficiently to warrant the condemnation of conviction.

■ Justice Acoba's dissenting opinion implies that the term "narcotic effect," as used in *Vance*, supports the "illicit effect" standard he advocates in this case. We expressly reject any such implication. In defining a

"dangerous drug" for purposes of, *inter alia*, promoting a dangerous drug in the third degree, HRS § 712–1240 (1993) refers to the drug schedules contained in HRS chapter 329, the Uniform Controlled Substances Act. HRS chapter 329 defines a "narcotic drug" as

any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

(1) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate.

(2) Any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clause (1), but not including the isoquinoline alkaloids of opium.

(3) Opium poppy and poppy straw.

(4) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine.

HRS § 329–1 (1993). Thus, under our drug statutes, the term "narcotic drug" refers to a specific class of drugs.[10] Accordingly, with respect to our statutory scheme, a "narcotic effect" simply denotes the effect of those substances statutorily designated as narcotic drugs.

The defendants in *Vance* possessed cocaine and secobarbital. *Vance*, 61 Haw. at 304–05, 602 P.2d at 942–43. Both secobarbital and cocaine are Schedule II substances and, thus, "dangerous drugs." HRS § 712–1240. However, of the two substances, only cocaine is designated a "narcotic drug." HRS §§ 329–16, 329–1 (1976 and Supp.1999). In *Vance*, this court noted:

10. We are cognizant that the statutory definition of a "narcotic drug" conflicts with Dr. Read's

testimony in this case regarding the pharmacological definition of the same term.

In the present case, appellant John Vance was found in possession of .7584 gram of white powder analyzed to contain approximately 17.5 percent cocaine or a total of .1327 gram of the narcotic drug. Appellant Michael Vance was found in possession of three tablets identified as the dangerous drug secobarbital.

*Vance*, 61 Haw. at 304–05, 602 P.2d at 942–43. The foregoing evinces this court's recognition of the narrow statutory definition of "narcotic drug."

■ Nevertheless, to the extent *Vance* may be misinterpreted to support the illicit effect standard Justice Acoba now advocates, we reinforce that, with respect to the amount of drugs possessed, the proper inquiry in de minimis cases is whether the amount possessed could produce a pharmacological or physiological effect. *See State v. Hironaka*, 99 Hawai'i 198, 209, 53 P.3d 806, 817 (2002); *State v. Balanza*, 93 Hawai'i 279, 283–85, 1 P.3d 281, 285–87 (2000); *Viernes*, 92 Hawai'i at 134, 988 P.2d at 199. We note that Justice Acoba has, on occasion, agreed with this standard. *See Hironaka*, 99 Hawai'i at 209, 53 P.3d at 817 (Acoba, J. concurring) (concurring with his characterization of this court's opinion "requiring a defendant to establish 'that the amount of the drug he or she possessed is incapable of producing *any* pharmacological or physiological effect.' "); *but see State v. Carmichael*, 99 Hawai'i 75, 95, 53 P.3d 214, 234 (2002) (Acoba, J. dissenting) (stating that "[i]t follows from *Vance* that a useable amount, which disqualifies a defendant from HRS § 702–236 consideration, is one which produces the subject drug's characteristically desired effect: in *Vance*, a narcotic effect, or, in this case, according to the uncontroverted testimony of Read, one of euphoria or elation."). Moreover, given that the proper standard to apply in de minimis cases has been established by precedent, the trial court in the instant case was bound to adhere to it and, thus, could not have properly adopted an "illicit effect" standard. *See State ex rel. Price v. Magoon*, 75 Haw. 164, 186, 858 P.2d 712, 723, *reconsideration de-*

*nied*, 75 Haw. 580, 861 P.2d 735 (1993) (citation omitted).

■ In the present case, the defense stipulated that the aggregate weight of the substance recovered from Fukagawa's pipe weighed .018 grams. As previously stated, Read testified that, with respect to methamphetamine, doses as low as .005 grams, less than one-third the amount recovered from Fukagawa's pipe, were used to treat ADHD. Thus, according to Read's testimony, .018 grams of methamphetamine is sufficient to produce a pharmacological effect. With respect to Fukagawa's argument that the entire substance recovered was not methamphetamine and contained only trace amounts of the drug, Read testified that: (1) because of the difficulty in speaking generally about the purity of drugs obtained on the street, "[y]ou almost have to talk about a specific product, some specific products that's [sic] been analyzed"; (2) he performed no analysis of the substance recovered in the instant case; and (3) he did not know how much methamphetamine remained in the substance recovered from the pipe. Read did not testify that the substance recovered in the instant case could not produce a pharmacological effect. Accordingly, the circuit court's finding that the residue contained a sufficient amount of methamphetamine to produce a pharmacological effect is a reasonable inference from the record.[11] Additionally, the court's determination that "this was an amount that was usable" is supported by Lee's testimony that the substance recovered from Fukagawa's pipe may have constituted an amount sufficient to be "used" by someone. Moreover, Fukagawa does not challenge the circuit court's finding he, in fact, used the methamphetamine, and use is one of the evils sought to be prevented by HRS § 712–1243.

■ Furthermore, it is well-settled that " '[a]n appellate court may affirm a judgment of the lower court on any ground in the record that supports affirmance.' " *State v.*

---

11. We note that the motions court's findings may be interpreted to indicated that it believed the entire recovered substance was methamphetamine. However, inasmuch as the evidence adduced at trial supports the finding that the recovered substance contained a sufficient amount of methamphetamine to yield a not insignificant pharmacological effect, the motions court's misstatement was harmless.

*Dow,* 96 Hawai'i 320, 326, 30 P.3d 926, 932 (2001) (quoting *State v. Ross,* 89 Hawai'i 371, 378 n. 4, 974 P.2d 11, 18 n. 4 (1998)). As previously indicated, the defendant bears the burden of establishing that "his or her conduct neither caused nor threatened to cause the harm or evil that the statute, under which he or she is charged, seeks to prevent." *Oughterson,* at 256, 54 P.3d at 427. In advancing a motion to dismiss a charge as a de minimis offense, the defendant must address both "the nature of the conduct alleged *and* the nature of the attendant circumstances." HRS § 702–236(1) (emphasis added). Further, as we have indicated *supra,* dismissal of a prosecution without any indicators from the surrounding circumstances that demonstrate a de minimis infraction would constitute an abuse of discretion. *See Park,* 55 Haw. at 617, 525 P.2d at 591–92. In the present case, however, the defense focused solely upon the amount of methamphetamine possessed and presented neither testimony nor other evidence regarding the circumstances attendant to Fukagawa's possession of drug paraphernalia and the substance containing methamphetamine.

In light of the defendant's burden to prove that his conduct constituted a de minimis infraction and the evidence adduced in this case, we hold that the court did not abuse its discretion in refusing to dismiss the charge of promoting a dangerous drug in the third degree.

## IV. *CONCLUSION*

Based upon the foregoing, we affirm the order denying Fukagawa's motion to dismiss and the judgment of conviction and sentence of the circuit court.

### Dissenting Opinion by RAMIL, J.

This case is another example of why we should overrule *State v. Viernes,* 92 Hawai'i 130, 988 P.2d 195 (1999). For the reasons discussed in *State v. Carmichael,* 99 Hawai'i 75, 53 P.3d 214 (2002), I respectfully dissent.

### Dissenting Opinion of ACOBA, J.

I believe that Defendant–Appellant Ivan Fukagawa (Defendant) met the threshold requirements for a *de minimis* dismissal in this drug possession case and that the denial of his motion to dismiss on the grounds announced by the circuit court of the second circuit (the court) was an abuse of discretion.[1] I do not agree, as the majority contends, that a disqualifying "inquiry" for drug *de minimis* cases is whether the amount of a drug possessed is capable of producing *any* pharmacological or physiological effect. *See* majority opinion at 506, 60 P.3d at 907. That standard is not tied to illicit use and, thus, would embrace instances where the harm or evil sought to be prevented by the drug offense statutes did not exist. I note further that the majority, by citing grounds not depended on by the court in its decision to reject Defendant's motion, has, on the appellate level, erroneously exercised the discretion reserved only to the court on the trial level. *See* Hawai'i Revised Statutes (HRS) § 702–236 (1993). Thus, I respectfully dissent.

## I.

The following are the undisputed circumstances of the case. On March 5, 1998, Defendant was stopped for speeding by an officer of the Maui Police Department. The officer detected a strong odor of liquor coming from Defendant's breath. Defendant was arrested. His breath test at the station house showed a BAC of 0.135%. At the station house, a glass pipe was recovered from Defendant's left pants pocket. Defendant was later indicted for driving under the influence (DUI) of intoxicating liquor, for promoting a dangerous drug in the third degree, and for possession of drug paraphernalia.

On July 1, 1999, at the hearing on the motion, both parties stipulated that the residue found in the pipe seized was tested, that the *residue* weighed .018 grams, that it "contain[ed] methamphetamine," and that the residue was visible to the naked eye. No evidence was adduced concerning the amount of methamphetamine in the residue.

In a memorandum in support of his motion to dismiss Count II, promoting a dangerous drug in the third degree, HRS § 712–1243(1) (1993), Defendant argued that, under HRS

---

1. While I do not agree with the trial court, I believe it acted conscientiously in this case.

§ 702–236(1)(b), possession of .018 grams of methamphetamine was a *de minimis* infraction because that amount could not be sold or used for either legitimate or illicit purposes.[2]

On June 10, 1999, Plaintiff–Appellee State of Hawai'i (the prosecution) filed an opposition memorandum contending that Defendant's criminal conduct did meet the requirements of HRS § 712–1243(1) because knowing possession of the drug in any amount was the harm sought to be prevented by that statute.

In relevant part, HRS § 702–236(1) states:

**De minimis infractions.** (1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:

. . . .

(b) *Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction;* or

(c) Presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.

(Emphasis added.)

A.

The defense called University of Hawai'i Emeritus Professor of Pharmacology, George W. Read, Ph.D., as its expert witness.[3] The court duly qualified Read as an expert in the field of pharmacology. Read's testimony established that: (1) pharmacology is "the study of chemicals on living organisms and any effect of the drug on all aspects of it"; (2) "dose response" is "a classical fundamental form of pharmacology, and dose response relationship merely states that the more of a drug you give, the more effect you get from it"; (3) he relied on data and studies concerning methamphetamine dosages for therapeutic uses and amounts of methamphetamine reportedly taken by illicit users; (4) average dosage amounts and three current legal therapeutic uses of methamphetamine are .01 to .04 grams for treating obesity, .05 to .06 grams for narcolepsy, and .005 to .015 grams for attention deficit hyperactive disorder (ADHD) in children; (5) during World War II, pilots on combat missions received between .01 and .04 grams to fight fatigue; and (6) dosages for illicit use had been recorded as ranging from .4 grams to 1.7 grams a day.

Using various sources,[4] Read concluded that the minimum amount of dosage required for a "naive user"[5] or for a first time user to experience "the desired effect [of euphoria and elation] from methamphetamine would fall within a starting dose range of ".05 to .1 grams"; and the minimum effective illicit use dose for an average sized person "depended on body size, so a very small person would use .05 grams and a large person .1 grams." Read extrapolated the .05 to .1 gram minimum effective dose range for illicit use on

2. Alternatively, Defendant contended that, under HRS § 702–236(1)(c), the amount recovered, coupled with other factors such as the harshness of the prescribed sentence—a five-year prison term without the possibility of probation—warranted dismissal of the charge.

3. According to Defense Exhibit B, "Curriculum Vitae of George Wesley Read, September 26, 1998," Professor Read is emeritus professor of pharmacology at the University of Hawai'i School of Medicine. He received his bachelor's degree in biology from Stanford University, master's degree in physiology from Stanford University, and Ph.D. in pharmacology from the University of Hawai'i School of Medicine. Read has published approximately fifty articles on pharmacology.

4. According to Read, his sources included: J. DiPalma, *Drill's Pharmacology in Medicine* (3d ed.1965); J. Hardman, L. Limbird, P. Molinoff, R. Ruddon, A. Gilman, *Goodman & Gilman's The Pharmacological Basis of Therapeutics* (9th ed.1996); Ellinwood, *Assault and Homicide Associated with Amphetamine Abuse*, 127 Am. J. Psychiatry 9 (1971); R. Lehne, *Pharmacology for Nursing Care* (1998); K. Olson, *Poisoning & Drug Overdose* (1994); R. Pinger, W. Payne, D. Hahn, *Drugs* (2d ed.1995); and T. Sollman, *A Manual of Pharmacology* (1957) (taken from G. Read, "Methamphetamine Doses for Various Actions," Defense Exhibit C (May 10, 1999) (unpublished table)).

5. Read describes a "naive user" as "someone who [is] not tolerant, or a person who used [the drug] irregularly and . . . didn't have opportunity to develop tolerance [who] could take a lot smaller dose and achieve the same euphoria and elation [as regular users.]"

the basis of the purity of drug samples purchased on the streets and other information pertinent to each individual drug user.[6]

More importantly, Dr. Read stated that what is left in the pipe after the substance is smoked are "trace amounts of the drug" that "might just be a few percent of the active drug."

> You almost have to talk about a specific product, some specific products that's been analyzed, and then you see very clearly what the purity is, but it is very clear that there are salts that go along with it from which the free-base is precipitated, and then this is put into a pipe and smoked, and the salts are not volatile, so they remain in the pipe and the drug, itself,—the active ingredient volatizes from the heat and can be inhaled, and so that leaves *the residue behind which is just—has trace amounts of the drug, so there is a difference between what's actually purchased and what is actually found in a pipe because what's found in the pipe is the remainder after most of the drug is gone. That might just be a few percent of the active drug.*

(Emphasis added.) In responding to the question of what he meant by "trace amounts," Dr. Read testified that "[t]here are also things present in trace amounts which would be like a few percent, *so trace amounts means very, very small compared to the major item in a product.*" (Emphasis added.)

With respect to the instant case, Read related that, even if the sample had been "pure," without contamination and purchased from a reputable drug company, it would still not produce the high that an illicit user would seek. Read explained that a pure sample of .018 grams would have, at most, therapeutic use. In conclusion, Read opined that .018 grams of a substance containing methamphetamine *was not an effective illicit dose, was unsaleable, and was incapable of producing an illicit "pharmacological effect":*

> Q. [DEFENSE ATTORNEY] Doctor Read, in your expert opinion would eighteen milligrams or .018 grams produce a euphoric or *pharmacological effect for an illicit user?*

> A. *No.* A person of—average normal person I would not expect that would produce any of the effects that they would be after. If it were pure methamphetamine, if that was .018 of methamphetamine, even then I don't think it would produce the high that would be sought after.

> Q. In your opinion would a person be able to use that .018 grams as an item for sale?

> A. *Not for illicit use.* If it were from a drug company and known to be pure, it would have use therapeutically. At that level it could be used, but no physician or researcher would buy an uncertified drug
>
> . . . .

(Emphases added.)

On cross-examination, the prosecution established that Read had not "done any kind of particular factoring of . . . [Defendant's] weight to come up with dose response"; that Read had not accounted "for his height," "his drug use history," "his muscle-to-body fat ratio," "or his overall physical health." But, as Read responded, if Defendant were not a first-time user, more of the drug would be required to produce an effect:

> A. All I have given is a range here which would encompass the minimum to the maximum for a naive user. Now, if the person were not a naive user, it would take considerab[ly] more than this. It would take like the [Ellinwood] study in tolerant users, would take a lot more, so it would be even harder to have an effect.

> Q. Somebody who doesn't generally use all the time is going to have an effect with a lower dose?

> A. Right.

The court asked how specific dosages physically impact those persons taking methamphetamine for legitimate purposes. Dr. Read responded that there would be *no detectable effect* below the "minimum effective dose" and that .015 grams would have an effect on children for therapeutic purposes:

> Q. So any amount of this methamphetamine that a person takes is going to affect the central nervous system, correct? . . .

6. *See supra* note 4.

A. *When you get below the minimum effective dose, there's no detectable effect.*

Q. What amount is that?

A. Well, by definition minimum effective dose would be the minimum that would have an effect, and it would depend on what action you are looking for....

Q. *.015 [grams] would have an effect?* ... That would be the highest end for treatment of [ADHD]?

A. *Right ... in children....* They treat them for years and years. They don't become addicted.

(Emphases added.)

### B.

For the prosecution, police officer Dennis Lee testified that he was a narcotics investigator with the Maui County Division and had received formal training in the testing and identification of illegal drugs and drug paraphernalia.[7] Although Lee was questioned with respect to drug and drug paraphernalia identification, the prosecution did not offer Lee as an expert at all.

When asked by the prosecution, "Can you tell me if the residue in the pipe you tested prior to your scraping and field testing was of an amount sufficient to be used by somebody?" Lee replied, "Possibly yes." Defense counsel objected to the question on the ground that Lee was not qualified to answer it. The court overruled the objection on the ground that the answer went to the weight of the evidence. After doing so, the court again asked Lee to state his answer to the previous question. He said, "Yes."

On cross-examination, Lee reported that he had not received a Bachelor of Science degree in any physical chemistry sciences and that the test he performed does not indicate the amount of methamphetamine in the substance he tested.

### C.

The court identified the following grounds for denying Defendant's *de minimis* motion:

The amount that was actually measured here in the lab which apparently was less than the actual amount of amphetamine ... *is more than the maximum dosage used ... to correct [ADHD]. It is more than the maximum dose recommended by one of the studies, one of three studies for obesity, and it is more than the maximum dosage recommended by one of the four studies for the treatment of narcolepsy,* so it is obvious that while one might debate how much is enough to get a person high, that this was an amount that was usable, and then, also, the evidence shows that it was in a pipe and so on.

*It was obviously there to be used by the [D]efendant. He probably used it, in fact. So it was not the kind of situation where a person borrowed a car and [there] just happened to be something in the ashtray.* It was a very small amount, and we are looking at a fact situation where [it would] be really a miscarriage of justice for the person to end up with felony conviction because of inadvertance or something like that.

*Here we have a person who had the equipment to use it, no doubt was using it,* and that is the very harm that the statute is intended to address.

Now, [*State v. Vance*, 61 Haw. 291, 602 P.2d 933, *reh'g denied*, 61 Haw. 661, 601 P.2d 933 (1979),] as pointed out talks about the possibility of applying the de minimis standard if there's—the amount is micro-

7. ˙Police officer Dennis Lee described his training as follows:

A. I received eight hours of specialized training from Bectin Dickinson instructors in the field testing of illegal drugs.

Q. [PROSECUTOR] How about in drug identification?

A: Yes.

Q: Investigation?

A: I received forty hours of basic investigation and drug identification from the Drug Enforcement Administration.

....

Q: Are you certified by the Maui Police Department to field test evidence for the presence of illegal drugs?

A: Yes.

....

Q: . . *[H]ave you had to test evidence* in the past for the presence of methamphetamine?

A: Yes, sir.

Q: And can you estimate how many times you may have done that?

A: Well over a hundred.

(Emphasis added.)

scopic or infinitesimal, and in fact unusable as a narcotic. I am reading the word narcotic to include with—what do you call it—stimulant, and what I am assuming the Court means a drug that has, at least, potential for and affects the central nervous system or the mind, and here I think the amount clearly could do that, and that the de minimis standard would be inappropriate to apply, and I am going to deny the motion.

(Emphases added.) A written order denying the motion to dismiss was subsequently filed on July 12, 1999.

## II.

Defendant appeals the July 12, 1999 order denying his motion to dismiss Count II of the indictment on two grounds. The first ground is that the court erred in admitting Lee's testimony that the residue scraped from the pipe was a useable amount; the second ground is that the court abused its discretion when it denied Defendant's motion to dismiss his possession as a *de minimis* violation under HRS § 702–236(1).[8]

## III.

As to his first ground, Defendant argues that Lee's testimony characterizing the residue as useable should not have been admitted, because Lee was not qualified as an expert witness under Hawai'i Rules of Evidence (HRE) Rule 702–(1993). He maintains that Lee's testimony involved knowledge not known to lay witnesses pursuant to HRE Rule 701 (1993), and no foundation was laid for this type of testimony. The defense thus contends that Lee's testimony could not have been admitted as expert testimony. Additionally, Defendant urges that, inasmuch as Lee's opinion was a lay one and he had not been qualified as an expert, the court's ruling that an expert's testimony goes to weight rather than admissibility is not applicable. I believe Defendant is correct, and the court erred in overruling his objection.

8. Since the arguments in the briefs relate only to Count II, the judgment and sentences rendered on Counts I and III must be affirmed.

9. I refer to authorities construing the Federal Rules of Evidence (FRE) because the HRE are

## IV.

Before expert testimony can be admitted into evidence, the witness must be qualified as an expert. *See* HRE Rule 702. Whether a witness is qualified to give evidence as an expert is governed by HRE Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Thus, a witness may qualify as an expert if he or she possesses a background in any one of five areas contemplated by HRE Rule 702: knowledge, skill, experience, training, or education. *See id.* (citing 29 C. Wright & V. Gold, *Federal Practice and Procedure: Evidence*, § 6263, at 191 (1997).)[9]

In *Nielsen v. American Honda Motor, Co.*, 92 Hawai'i 180, 989 P.2d 264 (App.), *cert. dismissed*, 92 Hawai'i 180, 989 P.2d 264 (1999), the Intermediate Court of Appeals acknowledged that other cases have held in the past that " '[i]t is not necessary that the expert witnesses have the highest possible qualifications to testify about a particular matter[.]' " *Id.* at 189, 989 P.2d at 273 (quoting *Larsen v. State Savings & Loan Ass'n*, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982)). " 'Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.' " *Id.* (quoting *Larsen*, 64 Haw. at 304, 640 P.2d at 288). Police officers have been determined to qualify as experts by reason of experience or specialized training. *See State v. Lloyd*, 61 Haw. 505, 515, 606 P.2d 913, 920 (1980) (citing *State v. Maupin*, 42 Ohio St.2d 473, 330 N.E.2d 708 (1975)). *See also State v. Nishi*, 9 Haw.App. 516, 523, 852 P.2d 476, 480 (1993) (holding that a police officer's testimony should be admitted as expert testimony, especially where a foundation for

patterned after those rules. *See State v. Ito*, 90 Hawai'i 225, 236 n. 7, 978 P.2d 191, 202 n. 7 (App.1999) (HRE covering "admission of scientific evidence are patterned after [FRE Rules] 702 and 703").

knowledge and skills possessed by the officer was laid by counsel).

## V.

Substantively, Lee's statements consisted of more than the mere opinion testimony of a lay witness. A lay witness can only testify as "to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of witness'[s] testimony or the determination of a fact in issue." HRE Rule 701. Instead, Lee testified as to knowledge not generally known in the populace and for which he had received training by the Maui police department. A foundation was laid by the prosecution with respect to Lee's qualifications in the area of drug and drug paraphernalia identification and basic investigation, but not in connection with any "euphoric or pharmacological" effect that might result from trace amounts of methamphetamine. Lee was not qualified as an expert and the prosecution did not attempt to so qualify him. Accordingly, Lee's testimony that residue might "possibly" be "used by somebody" would be inadmissible insofar as it related to any "effect" of the residue on a person.

## VI.

With respect to Defendant's second ground, we review a court's decision for abuse of discretion by assessing whether the court "clearly exceed[ed] the bounds of reason or disregard[ed] rules or principles of law or practice to the substantial detriment of a party litigant" is required. *State v. Klinge,* 92 Hawai'i 577, 584, 994 P.2d 509, 516, *reconsideration denied,* 92 Hawai'i 577, 994 P.2d 509 (2000) (citations omitted); *see also State v. Sacoco,* 45 Haw. 288, 292, 367 P.2d 11, 13 (1961). I must conclude that the court did abuse its discretion.

Although possession of "any amount" of methamphetamine "technically violates HRS § 712–1243," it may "nonetheless [be] de minimis pursuant to HRS § 702–236." *State v. Viernes,* 92 Hawai'i 130, 135, 988 P.2d 195, 200 (1999). In a charge under HRS § 712–1243, circumstances disqualifying a defendant from HRS § 702–236(1)(b) consideration must directly implicate the harm or "evil sought to be controlled." *Vance,* 61 Haw. at 307, 602 P.2d at 944. This implication in-cludes the "possession of a microscopic amount in combination with other factors such as the ability to use, to sell, or to distribute the drug which must be introduced as evidence." *Id.* One of the evils sought to be controlled by statutes prohibiting possession of drugs is crime linked to the perpetuation of a drug habit. Thus, an additional consideration is whether, at the time of possession as charged, the defendant was engaged in a crime to support a drug habit. *See State v. Carmichael,* 99 Hawai'i 75, 100, 53 P.3d 214, 239 (2002) (Acoba, J., dissenting).

It is undisputed that there was no evidence in the surrounding circumstances of a sale or distribution of the dangerous drug here or that Defendant was involved in a crime to support a drug habit at the time. *See supra* Part I. The pivotal question, then, is whether there was evidence adduced that the trace amount of methamphetamine in the residue was useable.

## VII.

The majority posits that the "proper inquiry" to apply in drug *de minimis* cases "is whether the amount possessed could produce a pharmacological or physiological effect." Majority opinion at 506, 60 P.3d at 907 (citing *State v. Hironaka,* 99 Hawai'i 198, 53 P.3d 806 (2002); *State v. Balanza,* 93 Hawai'i 279, 285, 1 P.3d 281, 287 (2000); *Viernes,* 92 Hawai'i at 134, 988 P.2d at 199). This standard as employed by the majority, however, is meaningless, because it has no reference to the "harm or evil sought to be prevented by the law defining the offense," HRS § 702–236(1)(b), and, thus, could result in convictions where the harm or evil sought to be alleviated by the law is not threatened. In *Vance,* this court related that dismissal on *de minimis* grounds should not be entered if the amount of drug possessed, in that case cocaine, was sufficient to cause a "narcotic" effect, inasmuch as an amount having that characteristic was likely to be used or sold:

> The evil sought to be controlled by the statutes mentioned above is the use of narcotic drugs and their sale or transfer for ultimate use. *Where the amount of narcotics possessed is an amount which*

*can be used as a narcotic, the probability of use is very high and the protection of society demands that the possession be proscribed.* However, *where the amount is microscopic or is infinitesimal and in fact unusable as a narcotic, the possibility of unlawful sale or use does not exist, and proscription of possession under these circumstances may be inconsistent with the rationale of the statutory scheme of narcotics control.* Thus, the possession of a microscopic amount in combination with other factors indicating an inability to use or sell the narcotic, may constitute a de minimis infraction[.]

*Vance*, 61 Haw. at 307, 602 P.2d at 943 (emphases added). The genesis of this court's *de minimis* analysis, as it applies in drug cases, thus lies in the recognition that it is an amount that produces an illicit effect that is germane to our inquiry. That proposition applies to methamphetamine, inasmuch as it is, like cocaine, a dangerous drug.[10] It was similarly recognized in *Viernes* that, "if the quantity of a controlled substance is so minuscule that it cannot be sold or used in such a way as to have any *discernible effect* on the human body, it follows that the drug cannot lead to *abuse, social harm, or property and violent crimes.*" *Viernes*, 92 Hawai'i at 134, 988 P.2d at 199 (emphases added). The Commentary on HRS §§ 712-1241 to 712-1250, the statutes enumerating drug offenses, identifies the ultimate harm sought to be avoided as "physical dependence in the user" which stems from "a high tolerance level" to drugs and "addicti[on]." The standard in our cases that objectively relates to the *de minimis* standard, then, is not whether a trace amount is capable of producing *any* pharmacological or physiological effect which, by definition, would encompass a legal

*therapeutic* dosage, but rather, whether the trace amount involved is capable of producing an *illicit* effect. *See Carmichael*, 99 Hawai'i at 95, 53 P.3d at 234 (Acoba, J., dissenting); *Vance*, 61 Haw. at 307, 602 P.2d at 943.

As *Vance* indicates, the *de minimis* test in drug cases must be focused on whether the effect is one achieved by the illegal use of drugs, not on beneficial doses that have been medically approved. For example, the fact that a certain dosage of methamphetamine is used to treat obesity or ADHD in children is not relevant to the question of whether the amount possessed threatened the harm the possession statute was intended to prevent. In this case, no witness testified that the drug possessed would produce an illicit pharmacological effect; to the contrary, Dr. Read, the only witness qualified to testify to that issue, declared that the amount of residue recovered from the pipe, even if pure methamphetamine, would not produce the euphoria or elation sought by illegal users of the drug. That was the only competent evidence presented to the court on the question of whether the trace amount was useable as contemplated under HRS § 702-236(1).

## VIII.

With all due respect, it would be disingenuous to suggest that the effect prohibited, pertinent to the application of the *de minimis* statute, is *any* effect, rather than that effect sought in the criminal use of the drug.[11] *Vance* established that only an amount that would produce a "narcotic[, *i.e.*, illicit] effect[,]" *Vance*, 61 Haw. at 304, 602 P.2d at 942, would implicate the harm sought to be prevented, as opposed to an amount "in fact unusable as a narcotic" as to which "the possibility of unlawful sale or use does not

10. As was previously mentioned,
    [w]hile the specific drugs involved in *Vance* were cocaine and secobarbital, *see* [61 Haw. at 305, 602 P.2d at 943,] and, thus, "narcotic drugs," as the court noted, the fact that methamphetamine is not a narcotic drug would not preclude application of the principles set forth in *Vance*. *Id*. As Read explained, the term "narcotic" refers to a drug that is a depressant, although the term has "evolved" into a definition for an "addict[ive]" drug. In *Vance*, this court's analysis generally concerned "a literal application of" HRS § 712-1243 in a prosecution "for possession of a microscopic

trace of a *dangerous drug*," *id*. at 307, 602 P.2d at 944 (emphasis added), and, therefore, pertained to all such "dangerous drugs," not only those drugs which could be said to have a narcotic or addictive effect.
*Carmichael*, 99 Hawai'i at 93, 53 P.3d at 232 (Acoba, J., dissenting).

11. It is also incorrect to assert that "Read did not testify that the substance recovered in the instant case could not produce a pharmacological effect[,]" majority opinion at 506, 60 P.3d at 907, because it is undisputed that the amount was unmeasurable.

exist." *Id.* at 307, 602 P.2d at 944. *Viernes* adopted the foregoing proposition from *Vance*.

> [W]here the amount is microscopic or is infinitesimal and *in fact unusable as a narcotic, the possibility of unlawful sale or use does not exist*, and proscription of possession under these circumstances may be inconsistent with the rationale of the statutory scheme of narcotics control.

*Viernes*, 92 Hawai'i at 134, 988 P.2d at 199 (quoting *Vance*, 61 Haw. at 307, 602 P.2d at 944) (emphasis omitted) (emphasis added). Hence, when *Viernes* referred to a "discernible effect," it was in the context of the *Vance* formulation.

> *As Vance suggests,* however, if the quantity of a controlled substance is so minuscule that it cannot be sold or used in such a way as to have any *discernible effect* on the human body, it follows that the drug cannot lead to abuse, social harm, or property and violent crimes. Accordingly, "proscription of possession under these circumstances may be inconsistent with the rationale of the statutory scheme of narcotics control." [*Vance,* 61 Haw. at 307, 602 P.2d at 944].

*Viernes*, 92 Hawai'i at 134, 988 P.2d at 199 (emphases added). The phrase "pharmacological or physiological effect" set out in *Viernes* was used to refer to the *Vance* formulation of what was "useable" or "saleable," *i.e.,* that which would have an illicit effect.

> [The defendant] adduced uncontroverted evidence that .001 grams of methamphetamine (1) *could not produce any pharmacological action or physiological effect* and (2) was not saleable. Inasmuch as the .001 grams of methamphetamine was infinitesimal and *was neither useable nor saleable, it could not engender any abuse or social harm.*

**12.** *State v. Oughterson*, 99 Hawai'i 244, 54 P.3d 415 (2002), *Hironaka*, and *State v. Balanza*, 93 Hawai'i 279, 285, 1 P.3d 281, 287 (2000), cited by the majority, *see* majority opinion at 504, 506, 60 P.3d at 905, 907, were issued after this case was decided below.

**13.** This point and Dr. Read's position regarding the term "narcotic" was covered before:

> While the specific drugs involved in *Vance* were cocaine and secobarbital, *see* [*Vance,* 61 Haw. at 305, 602 P.2d at 943,] . . . [referred to

*Viernes*, 92 Hawai'i at 134–35, 988 P.2d at 199–200 (emphases added) (footnote omitted). Understandably, then, in *Viernes*, this court emphasized the fact that the potential evil related only to that amount that produced an illicit effect. Indeed, this court labeled as "specious" the contrary position the majority now apparently adopts.

> The prosecution argues that, inasmuch as the .001 grams of methamphetamine could be injected or smoked, it was useable, and therefore an "evil sought to be controlled by the statute." *See Vance,* 61 Haw. at 307, 602 P.2d at 944. *This argument is specious.* The *Vance* court *did not suggest that any "useable" substance posed a potential evil, but, rather, only those substances "which can be used as a narcotic."* *Id.* (emphasis added).

*Viernes*, 92 Hawai'i at 134 n. 6, 988 P.2d at 199 n. 6 (emphases added). Therefore, contrary to the majority's declaration, *Viernes* was precedent at the time this case was decided, and indicated it was an illicit or prohibited effect that was germane to the *de minimis* issue.[12] Plainly, the majority's position clashes with and is inconsistent with *Vance* and *Viernes*.

### IX.

Inexplicably, the majority suggests that the term "narcotic" is limited to its use in HRS § 329–1 (1993). *See* majority opinion at 506–507, 60 P.3d at 907–908. That section was not cited to, quoted, or relevant to this court's discussion of the term in *Vance.* Its suggestion that *Vance* "evinces this court's recognition of the narrow statutory definition of 'narcotic drug[,]' " majority opinion at 506, 60 P.3d at 907, then, is erroneous. The term "narcotic" has not been precisely employed in our cases.[13] Thus in *Viernes*, the majority

as] "narcotic drugs[ ]" [by the trial] court . . ., the fact that methamphetamine is not a narcotic drug would not preclude application of the principles set forth in *Vance. Id.* As [Dr.] Read explained, the term "narcotic" refers to a drug that is a *depressant, although the term has "evolved into a definition for an "addictive" drug.* In *Vance,* this court's analysis generally concerned "a literal application of" HRS § 712–1234 in a prosecution "for possession of a microscopic trace of a *dangerous drug," id.* at 307, 602 P.2d at 944 (emphasis added), and, therefore, pertained to all such "dangerous

itself referred to methamphetamine, although not a narcotic, as a "narcotic." *See Viernes,* 92 Hawai'i at 133, 988 P.2d at 198 (this court disagreed with the prosecution "[i]nasmuch as the quantity of *methamphetamine* possessed by [the defendant] was infinitesimal and unusable *as a narcotic,* and was thereby incapable of causing or threatening the harms sought to be prevented by HRS § 712–1243" (emphases added)). Obviously, the term "narcotic," as used in the vernacular, has come to refer to any addictive drug, and the misleading discourse as to that only obfuscates the issue.

As the discussion in the text *infra* indicates, the question is whether the amount involved produced the prohibited effect. Contrary to the majority's view, *Vance* did not make a distinction between two drugs for *de minimis* purposes. What was relevant was whether the amount of the drug could be used or sold, and that depended on whether the amount could produce the illicit or prohibited effect.

### X.

The majority mistakenly "note[s]" that I "ha[ve], on occasion, agreed" that "the proper inquiry in de minimis cases is whether the amount possessed could produce a pharmacological or physiological effect[,]" majority opinion at 506–507, 60 P.3d at 907–908, referring to my concurring opinion in *Hironaka.* To the contrary, in *Hironaka,* I did not agree with the majority's standard. Rather, I proposed a standard based on *Vance* and *Viernes* which, as restated above, identified the relevant physiological effect as one that produced an illicit or prohibited effect; *i.e.,* an amount that would be useable or saleable:

> In light of *Vance, Viernes,* and the legislative history of HRS § 712–1243, I believe courts faced with a motion to dismiss a drug-residue promotion of dangerous drugs case based on de minimis grounds should consider, as a threshold qualification for HRS § 712–1243 treatment,

drugs," not only those drugs which could be said to have a narcotic or addictive effect. *Carmichael,* 99 Hawai'i at 93, 53 P.3d at 232 (Acoba, J., dissenting) (footnote and brackets omitted) (emphasis added). Furthermore, the

whether *(1) the amount possessed was useable, or (2) the amount was saleable,* or (3) the defendant was engaged in a crime to support a drug habit at the time of possession.

*Hironaka,* 99 Hawai'i at 210, 53 P.3d at 818 (Acoba, J., concurring) (emphases added).

### XI.

Finally, in comparison to the majority's position, I do not "advocate[ ]" a new standard, *see* majority opinion at 506, 60 P.3d at 907, but only that formulation that is set out on the face of *Vance & Viernes. Viernes* being precedent, it binds not only the court, but this court as well. The only standard applicable, as demonstrated in the foregoing discussion, is the one first expressed in *Vance* and later ratified in *Viernes* by the majority, which now dubs it as a "misinterpret[ation]." Majority opinion at 506, 60 P.3d at 907. The so-called pharmacological or physiological effect has always been tied to the prohibited or illicit effect of a drug. The term "pharmacological effect" originated in Read's testimony in *Viernes.* The term was employed in the context of illicit use. *See Viernes,* 92 Hawai'i at 132, 988 P.2d at 197 (responding to the question of whether ".001 [grams of crystalline substance found in the defendant's possession] could ... in any way be used for sale or illicit use or even clinical use by an adult male[,]" Read stated, "Nowhere near enough to produce any action, pharmacological action that I'm aware of."). Hence, contrary to the majority's position, the term "pharmacological effect" taken from Read's testimony refers to illicit use. In conclusory fashion, the majority in a revisionist approach abrogates the express formulation of this court in *Vance* and its own decision in *Viernes.*

### XII.

The court, in its decision, apparently rested its rejection of the *de minimis* motion on four grounds. None of these grounds is

majority concedes that its definition of a " 'narcotic drug' conflicts with Dr. Read's testimony in this case regarding the pharmacological definition of the same term." Majority opinion at 505 n. 10, 60 P.3d at 906 n. 10.

accurately or rationally supported by the evidence.

### A.

As its first ground, the court mistakenly stated that "the amount that was actually measured ... *was less* than the actual amount of amphetamine ... more than the maximum dosage ... to correct [ADHD] ... [or] recommended by ... one of three studies for obesity and ... one of the four studies for treatment of narcolepsy ... and [thus] this was an amount that was useable[.]" In fact, the .018 grams was residue. Thus the amount that was measured "in the lab," *.018 grams, was more, not less than "the actual amount of methamphetamine"* which, according to Dr. Read, amounted to "trace amounts of the drug." (Emphasis added.)

It is true that a select group of Read's studies referred to by the court listed maximum dose amounts of under .018 grams. The Lehne, Olson, and Pinger studies all suggested a .015 grams maximum for ADHD *in children.* The Lehne study suggested a .015 grams maximum for obesity (where other studies list maximums of .040 and .030 grams), and the Olson study suggested a .015 grams maximum for narcolepsy (where other studies list maximums of .050, .060, and .040 grams). *See supra* note 4. However, all the dosage amounts listed by the Read chart were based on *pure* samples of methamphetamine *rather than on residue containing unknown trace amounts of methamphetamine, as in the instant case.*

Thus, the court's reliance on amounts used for legal purposes is misplaced. In each of the instances related above, the drug would be administered for legal, rather than illicit purposes. The maximum dose for treating ADHD in children is obviously inapplicable to Defendant, who was not a child. The majority's assertion that, because, as a general matter, .005 grams of pure methamphetamine could be "used to treat ADHD" and, thus, "is sufficient to produce a pharmacological effect[,]" majority opinion at 506, 60 P.3d at 907, simply skirts the question of whether the drug was useable for illicit purposes under the circumstances of this case.

Read's extrapolated dose range of .05 to .1 grams, as that amount of *pure* methamphetamine that would produce an illicit, euphoric effect, is based on an evaluation of many sources, including the Ellinwood study on the dosages taken by illicit users. *See supra* note 4. Read opined that this amount would be required for a starting user to achieve euphoria and elation, with higher dosages required for those who have abused the drug for a longer period of time. The amount of *residue* possessed by Defendant, .018 grams, clearly falls below the low end of Read's effective dosage range.[14]

The prosecution failed to adduce any contrary evidence as to this one of Read's conclusions. Assuming *arguendo* that Officer Lee's testimony that the drug residue was useable was admissible, such testimony amounted only to speculation. The officer offered no supporting facts for this conclusion and was not qualified to give it. His testimony was not adopted by the court in its findings. Nevertheless, the majority relies in part on Lee's testimony. *See* majority opinion at 506, 60 P.3d at 907 (Lee testified "that the substance recovered from Fukagawa's pipe may have constituted an amount sufficient to be 'used' by someone."). In doing so, it usurped the court's role and exercised the court's discretion under HRS § 702–236. *See Carmichael,* 99 Hawai'i at 96, 53 P.3d at 235 (Acoba, J., dissenting) (explaining that the plurality, by substituting its reasoning for that of the trial court, "essentially supplants the trial judge's thinking with [its] own").

### B.

For its second ground, the court suggested it would grant a *de minimis* motion "where a person borrowed a car and [there] just happened to be something in the ashtray." Under the example used by the court, promotion of a dangerous drug would be a strict liability offense. If the drug "just happened to be ... in the ashtray," the defendant would lack any culpable state of mind, and under the facts posited, would be entitled to

---

14. Although Lee opined that a dose of .018 grams "possibly" could have been "used" by somebody, Lee, even if accepted as an expert in this area, did not testify as to whether this amount would cause the prohibited effect.

an acquittal. *See Carmichael,* 99 Hawai'i at 100, 53 P.3d at 239 (Acoba, J., dissenting) (indicating that "knowing[ ] possess[ion] of an unmeasurable amount contained in residue" must be proved ... "insofar as a legislative purpose to impose absolute liability for such offense" did not plainly appear). The *de minimis* paradigm announced by the court would be impossible to satisfy unless the defendant were not guilty, in which case the *de minimis* statute would not apply.

### C.

As its third basis, the court observed Defendant was "a person who had the equipment to use it, [and] no doubt was using it." As to the former observation, Defendant does not contest his conviction for possessing the glass pipe, and as to the latter, there is no evidence that he was "using" the residue at the time of his arrest, and he was not charged with such use. Because Defendant is charged with *possession,* the question is whether the trace amount of methamphetamine left in the residue would produce an illicit effect. All the admissible evidence before the court indicated the residue would not produce such an effect. The prosecution presented no evidence of the amount of useable methamphetamine left in the residue.

### D.

As to its fourth ground, the court agreed that under the case law, the question is whether the amount of methamphetamine is "in fact unuseable as a narcotic.... I am assuming the [supreme] court means a drug that has, at least potential for and affects the central nervous system or the mind." The court was substantially correct. However, the evidence before it was that whatever amount of methamphetamine was in the residue would not produce a euphoric or pharmacological effect.

The prosecution adduced no admissible evidence to rebut Read's conclusion that .018 grams of residue containing an unknown amount of methamphetamine was not useable

or saleable. Even the smallest amount of methamphetamine to be legitimately prescribed, .015 grams for ADHD, is calculated based on a one hundred percent pure sample of methamphetamine rather than mere residue. The laboratory report indicates that .018 grams was the *gross* weight of the *residue* that "contained methamphetamine"; thus, the amount of pure methamphetamine had to be less than .018 grams. Read's testimony that the residue was not saleable or useable was not validly disputed.

### XIII.

The majority contends it may affirm the court "on any ground in the record that supports affirmance," majority opinion at 506, 60 P.3d at 907, thus admitting that the reasons given by the court did not support its denial of the motion. As indicated *supra,* however, there is no ground in the record to support affirmance, considering (1) the unrebutted competent evidence produced by Dr. Read and (2) the absence of any surrounding circumstances that would disqualify Defendant from *de minimis* consideration.

The majority implies that the defense failed to present "testimony [or] other evidence regarding the circumstances attendant to [Defendant's] possession." Majority opinion at 507, 60 P.3d at 908. The surrounding circumstances were never questioned by the court or disputed by the parties inasmuch as such circumstances were not in controversy, *i.e.* the charge of driving under the influence of intoxicating liquor and a BAC of 0.135, and recovery of the glass pipe at the time of Defendant's booking. Accordingly, Defendant carried his burden of proof.[15]

### XIV.

Considering the evidence adduced at the hearing and the lack of any challenge to Read's credibility, I conclude the court's de-

---

15. The majority states that Defendant "bears the burden of establishing that 'his or her conduct neither caused nor threatened to cause the harm or evil that the statute, under which he or she is charged, seeks to prevent[,]' " majority opinion at 507, 60 P.3d at 908, citing *Oughterson,* 99 Hawai'i at 256, 54 P.3d at 427. That case was issued *after* the trial court had decided the instant case. The written order denying Defendant's motion to dismiss was filed on July 12, 1999. Nevertheless, Defendant clearly met his burden of proof as set forth *supra.*

nial of Defendant's motion exceeded the bounds of reason. Therefore, in my view, the court's July 12, 1999 order denying Defendant's motion, and the August 31, 1999 judgment and sentence insofar as it relates to Count II, should be reversed.[16]

---

**16.** Because I conclude the court abused its discretion in denying the motion to dismiss under the grounds set forth in HRS § 702–236(1)(b), I do not consider the arguments of the parties with respect to HRS § 702–236(1)(c).